IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

RONALD D. LOTT                                                                    PLAINTIFF

VS.                                                          CIVIL ACTION NO. 2:03cv508-KS-JMR

RENTAL SERVICE CORPORATION
(OF ARIZONA), *et al.*                                                          DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

The court has before it the motion of Defendant JLG Industries, Inc.("JLG") to exclude the testimony of the plaintiff's designated expert G. Fred Liebkemann.  Defendant Rental Service Corporation ("RSC") has joined in the motion.  From its review of the expert's reports and deposition testimony, the submissions of the parties in support of and in opposition to the motion, and applicable law, and having also analyzed Liebkemann's proposed testimony as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[1] the court finds that the defendants' motion should be granted.  The court finds more specifically as follows:

This action arises from a September 13, 2002 accident that occurred at the USA Yeast plant in Forrest County, Mississippi when the plaintiff was struck from behind and injured by a boom lift being operated by a fellow employee.  The lift was manufactured by JLG Industries, owned by RSC and leased by RSC to a contractor for use at the jobsite.  In his complaint the plaintiff asserted claims for strict liability, negligence and gross negligence against RSC based upon his contentions, among others,  that the boom lift was defectively designed [2] and that RSC knew or should have known that

---

[1]509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[2] By separate order, the court granted summary judgment on the plaintiff's design defect claim against RSC.

at the time it leased the lift to Higgins Electric the lift was without an operating safety alarm.  By

amended complaint the plaintiff alleged that the boom lift manufactured by JLG was defectively

designed because a blind spot obscured the operator's vision and because the lift was without an

appropriate safety alarm.

The plaintiff claims that JLG is strictly liable for manufacturing and placing into the stream

of commerce a defectively designed lift.   Such claims are now measured by the terms of

Mississippi's Products Liability Act, which codified strict liability law.  *Clark v. Brass Eagle, Inc.,*

866 So. 2d 456, 460 (¶ 16) (Miss. 2004).   Section 11-1-63 sets forth the elements the plaintiff must

establish before liability may be imposed:

(a)  The manufacturer or seller of the product shall not be liable if the claimant does not
prove by the preponderance of the evidence that at the time the product left the control of the
manufacturer or seller:

(i) ...   3.  The product was designed in a defective manner, ... and

(ii)      The defective condition rendered the product unreasonably dangerous to the user or
consumer; and

(iii)     The defective and unreasonably dangerous condition of the product proximately
caused the damages for which recovery is sought.

Miss. Code Ann. § 11-1-63(a) (Supp. 2004); *Austin v. Will-Burt Co.*, 361 F.3d 862, 867 (5th Cir.

2004).  The plaintiff must also prove that at the time the product left the manufacturer's control, the

manufacturer knew, or should have known, about the danger that caused the injury, and that the

product failed to function as expected, and that a feasible design alternative existed that would to a

reasonable probability have prevented the injury without impairing the utility of the product. Miss.

Code Ann. § 11-1-63(f) (Supp. 2004); *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 324 (5th Cir. 2004).

The plaintiff must offer admissible evidence to establish each element of his design defect claims.

*Watkins v. Telsmith, Inc.,* 121 F.3d 984, 993 (5th Cir. 1997); *Hammond v. Coleman Co.,* 61 F. Supp.

2d 533, 542 (S.D. Miss. 1999), *aff'd,* 209 F.3d 718 (5th Cir. 2000).    Plaintiff Lott relies on the

opinion testimony of G. Fred Liebkemann, a mechanical engineer, to meet this burden.

Federal Rule of Evidence 702 allows opinion testimony from a witness "qualified as an

expert by knowledge, skill, experience, training or education"if such testimony will assist the jury

and if the testimony "is the product of reliable principles and methods."[3] The Supreme Court's

decision of   *Daubert v. Merrell Dow Pharmaceuticals* [4] imposes upon this court the obligation to

"perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts

at issue in the case." *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 988-89 (5th Cir. 1997).    Applying

*Daubert*, the Fifth Circuit has instructed that "[a] district court should refuse to allow an expert

witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given

subject."  *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999).  Even if a witness is qualified, his

conclusions must pass the test of reliability under *Daubert*, which requires the court to "ensure

expert witnesses have employed reliable principles and methods in reaching their conclusions." *Guy*

*v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir. 2004); *see also Watkins v. Telsmith, Inc.,* 121

F.3d 984,992 (5th Cir. 1997) (affirming exclusion of testimony that "lacked the requisite indicia of

reliability"). Under the *Daubert* standard, speculative opinion testimony is not reliable opinion

testimony. *See Hammond v. Coleman Co.,* 61 F. Supp. 2d at 538-39 & n. 1.

The *Daubert* reliability analysis is flexible.  *Guy v. Crown Equip. Corp.,* 394 F.3d at 325.

Although the *Daubert* Court listed four factors relative to the inquiry, they are non-exclusive:

"Whether *Daubert*'s suggested indicia of reliability apply to any given testimony depends on the

nature of the issue at hand, the witness's particular expertise, and the subject of the testimony."

---

[3] Rule 702 also requires the testimony to be "based upon sufficient facts or data" and for
the witness to have "applied the principles and methods reliably to the facts of the case."

[4]509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*United States v. Norris,* 217 F.3d 262, 269 (5th Cir. 2000).   Application of those factors is, however, "germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Watkins v. Telsmith,* 121 F.3d  at 991.

In this case, the plaintiff intends to offer the testimony of G. Fred Liebkemann to establish that the boom lift was defectively designed because there was a blind area behind the turret; the lift had a motion alarm but not a unique reverse travel alarm; the output of the alarm it did have should have been directed into the blind area and was excessively loud; the rotating strobe light was improperly placed so that it did not shine into the blind area, and the machine was not equipped with fenders.[5]  Liebkemann familiarized himself with the allegedly defective lift by reviewing various manuals and documents associated with it and its use and by inspecting and photographing the machine itself.  He also reviewed  ANSI standards and OSHA regulations relative to boom lifts.

Although it may very well be that Liebkemann lacks the specialized knowledge or experience necessary to qualify him to offer opinions to the jury on the issues involved in this case,[6] what is made certain by his deposition testimony[7] is that his opinions lack foundation and methodology sufficient to render them reliable or helpful to the jury.

As to the blind area behind the turret:

---

[5] Liebkemann's findings and opinions are stated in reports dated February 18, 2005; May 20, 2005, and June 15, 2005.

[6] He has not published or taught in the area of boom lifts. He has no experience with the design or testing of boom lifts nor has he operated a boom lift of the type involved in this case. He inspected the lift on one occasion and then observed only one function of the lift–traveling forward and then in reverse to its original position.   He did not observe the lift in a work environment.  He did no research, performed no tests–except for observing the blind spot from the platform and listening to the alarm with tape covering it–and took no measurements on the lift relative to its characteristics as related in his reports.

[7] All references are to the deposition of G. Fred Liebkemann taken June 16, 2005.

Q.      Did you measure what you called the large blind area.

A.      No. I didn't.  ....  Nothing other than the photos is needed.  .... What I did was, I observed the blind area.  I did not run any tests to see if a blind area was present because no test was necessary.  It was open and obvious to anybody who looked.  I didn't do any research on a blind area, because the nature of it was open and obvious to anybody that looked.

Q.      And you didn't make any measurements and you didn't record anything in your notes?

A.      That is right. [8]

In his May 20, 2005 report Mr. Liebkemann acknowledged that the boom lift was equipped with an optional motion alarm that sounded upon any movement of the machine or the boom or the platform.  Although he finds fault with there being no "reverse signal alarm readily recognizable by pedestrian workers as a reverse travel alarm," his deposition testimony reveals no support for his contention that the lift should have had such an alarm:

Q.      Does any lift manufacturer make a motion alarm that sounds in one direction of travel only?

A.      I don't know.

Q.      Does any lift manufacturer make a motion alarm that is a unique reverse signal alarm as you used that term in your report?

A.      I don't know.

Q.      Now, you state that a failure to provide a proper reverse signal alarm in combination with the blind spot caused Mr. Lott's accident.  Did you do any testing to support that statement?

A.      No.

Q.      And you didn't do any reenactment to support that statement?

_____

[8] Deposition at 149-50, 153.  As an additional matter, Mr. Liebkemann did not propose a feasible design alternative which would eliminate the blind spot:

   Q.      Is it possible to make an articulating boom lift that doesn't have at least
           some area where the view of an operator is blocked by the turret?
   A.      For all practical purposes, I think, no.   Deposition at 154.

A.      No.

Q.      And you didn't do any research or case studies to support that statement?

A.      I did research. ....  I researched JLG's literature, which indicates there is no
        reverse signal alarm on the machine and I also inspected the machine and
        observed the blind spot.

Q.      That is all you did that you consider to be research?

A.      That is all I did and that is all that is necessary.[9]

None of the standards or regulations that he relied upon in formulating his opinions require a reverse

signal alarm. Deposition at 139-41, 143-44.  With respect to the so-called misdirection of the alarm,

Liebkemann could point to nothing to support his opinion that the alarm's audible output should be

directed in the area behind the turret, not even another manufacturer:

Q.      Now, does any lift manufacturer of a boom lift place a motion alarm so it is directed
        to the area behind the turret or base of the lift?

A.      That I do not know.

His only support was "common sense." Deposition at 158-60.   His opinion that the alarm output

is excessively loud enjoys no better support:

Q.      [W]hat is the minimum decibel level required to achieve an effective warning for a
        boom lift for indoor use?

A.      There is no such thing as a rule.

Q.      Did you do any research to see if there is a standard...for the minimum decibel level
        for a motion alarm on a boom lift for indoor use?

A.      I didn't need to.  The answer is open and obvious.[10]

With respect to placement of the strobe light, he had only his observation–not testing or

---

[9]  Deposition at 180, 182.  He did not challenge the effectiveness of the motion alarm as a
warning: "I am not saying it is ineffective as a warning.  What I am saying is, it is ineffective as a
backup alarm."  Deposition at 169.

[10] Deposition at 163.

research–to support his contention that it was improperly placed:

> Q.      Did you conduct any testing on strobe lights or their effectiveness?
>
> A.      No.
>
> Q.      Did you do any research or obtain any case studies or obtain any engineering publications that addressed the effectiveness of strobe lights?
>
> A.      No.
>
> Q.      Did you do any testing or research or obtain any case studies or bring forward any engineering treatises to support your statement that the strobe light on the JLG 300 was improperly placed?
>
> A.      Yes.  I observed it.[11]

And although he testified that he was "not aware of any reason" for the light's being placed where it was "as opposed to up on top near the back where it would warn people in the blind spot behind the machine," he did no testing of the "actual light output of the strobe light that is on the JLG 300 at various points around the turntable" to show that it didn't.  Deposition at 173, 174-75.  Asked whether he did any research to support his conclusion that "if a person can see the strobe light he can see the machine motion itself," he responded "No.  It is ridiculous.  It is open and obvious."[12]

The lift was not equipped with fenders.  Although Liebkemann interprets OSHA regulation 29 C.F.R. § 1926.602 as requiring fenders, other than just reading the requirement, he did no research into whether boom lifts are a type of motor vehicle to which the regulation applies:

> Q.      Does any lift manufacturer make a boom lift that has fenders?
>
> A.      I don't know if they do or not.
>
> Q.      Have you researched that issue?
>
> A.      I can tell you I haven't seen any.

---

[11] Deposition at 171-72.

[12] Deposition at 197.

Q.      Have you researched that issue?

A.      Yes. To the extent I have looked at lifts and seen them.

Q.      And how many boom lifts have you looked at?
A.      For the purpose of this case, maybe a dozen.

Q.      And did you see a single one that had fenders?

A.      No.

Q.      Are you aware of any boom lift manufacturer that places fenders on its boom lifts?

A.      No.

Q.      Now, did you do any research to see whether OSHA has interpreted 1926.602 as applicable to requiring fenders on boom lifts?

A.      No research, other than to read the requirement.  ....

Q.      Have you done any research into the applicable engineering treatises or publications to see if anyone has ever interpreted 1926.602 or any other provision of OSHA to require fenders on boom lifts?

A.      No.  I think the requirement speaks for itself. [13]

In his May 20, 2005 report, Liebkemann equates fenders with possible protection against a pedestrian's being trapped in the "ingoing pinch points just in front of each rolling wheel." In his deposition testimony, he describes "this stuff" as being "so obvious that it just doesn't require going on and on with worthless research."  Deposition at 187.  He also saw no reason to support with scientific methodology or scientific measurement or standards of reaction times his statement that "there is a substantial probability [Lott] would not have been hurt if there was a fender on this lift." As with the blind spot and the motion alarm and the strobe light, Liebkemann provides no foundation to support what, to him, "is an open and obvious fact."  Deposition at 195.

---

[13] Deposition at 183-85.

What the plaintiff's expert describes as "open and obvious" this court holds to be speculation and guesswork that certainly could not withstand the scrutiny of Mr. Liebkemann's professional peers.[14]   Simply because they are offered by an "expert," observations such as those made by Mr. Liebkemann which fall within the realm of "open and obvious" and "common sense" do not become opinions based on reliable principles and methods.[15]   As the testimony of the plaintiff's offered expert is neither reliable nor helpful, the court is compelled by *Daubert* and its progeny to find that it is also not admissible.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Defendant JLG Industries, Inc.'s Motion to Exclude Testimony of Plaintiff's Designated Expert G. Fred Liebkemann [#132] is hereby GRANTED.

SO ORDERED AND ADJUDGED on this, the 30th day of March, 2006.


s/ *Keith Starrett*
UNITED STATES DISTRICT JUDGE

---

[14] *See Watkins v. Telsmith,* 121 F.3d  at 991.

[15] *See Hammond v. Coleman Co.,* 61 F. Supp. 2d at 538-39 & n. 1.